ROYCE v. DELAWARE, L. & W. R. R.

(Circuit Court, S. D. New York. May 27, 1910.)

1. MASTER AND SERVANT (§ 189*)—INJURIES TO SERVANT—RAILROADS—SUPERINTENDENT.

Where, by a long-existing custom on defendant's road, when a conductor or engineer wished to call the superintendent, he telephoned to the chief dispatcher's office, where it was in the discretion of the person answering whether he would communicate with the superintendent or advise what should be done, the railroad company thereby substituted for the superintendent's direction that of the person in the dispatcher's office who received a message and directed what should be done, not only with reference to the movement of the train, but as to such matters as were within the duties of the superintendent.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 433; Dec. Dig. § 189.*]

2. MASTER AND SERVANT (§ 185*)—TOOLS AND APPLIANCES—DELEGATION OF DUTY.

Where a master delegates to fellow servants his own duty of providing servants with safe tools and appliances, he cannot excuse himself for a default because it arose from the negligence of those to whom the duty had been delegated.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 392–410; Dec. Dig. § 185.*]

3. MASTER AND SERVANT (§ 124*)—INJURIES TO SERVANT—DEFECTIVE LOCOMOTIVE—INSPECTION.

Where a railroad locomotive became defective on its trip, and it appeared that the engine, before going out, had been inspected and certain defects corrected, the duty to inspect did not again arise until the locomotive had been returned to the place where it could be examined and the defect remedied.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 235–242; Dec. Dig. § 124.*]

4. MASTER AND SERVANT (§ 185*)—INJURIES TO SERVANT— NEGLIGENCE—FELLOW SERVANTS.

A locomotive became disabled on one side en route, whereupon the conductor asked the train dispatcher for a pusher, which was promptly sent. No information was given by the train operatives that it was dangerous to run the engine further. *Held*, that there was no actionable negligence on the part of the railroad company; it not being liable for the negligence of the engineer and conductor in operating the train, they being fellow servants.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 401; Dec. Dig. § 185.*]

At Law. Action by Joseph M. Royce against the Delaware, Lackawanna & Western Railroad. Verdict was rendered for defendant, and plaintiff applies for a new trial. Denied.

See, also (C. C. A.) 176 Fed. 331.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Plaintiff was a brakeman on defendant's coal train from Scranton, Pa., to Hoboken, N. J. On running into a siding it was discovered that the upper guide on the left side of the engine had dropped off. The conductor, after consulting with the engineer, called the office of the chief train dispatcher at Hoboken and asked for a pusher. The engine was of the "Mother Hubbard" type; the cab being built over the boiler and fastened to it, leaving a place for the engineer to stand on the right side and for a brakeman on the left. The pusher was promptly sent, and the train proceeded, with the intention of leaving the engine for repairs at the Port Morris yard. On entering the yard the driving rod became disconnected and struck the floor of the cab, loosening one of the bolts that held it to the boiler, from which steam escaped and seriously injured plaintiff, who was on the left side of the cab.

Hatch & Clute, for plaintiff.
W. S. Jenney and J. L. Seager, for defendant.

HAND, District Judge. The evidence upon the alter ego in this trial is similar to that on the first, with the exception that now the plaintiff has proved that by the long-existing custom of the road, when a conductor or engineer wished to call the superintendent, he always telephoned to the chief dispatcher's office, and it was a question resting in the discretion of the person answering in that office whether he should himself communicate with the superintendent, or should advise what was to be done. By so doing I think that the road substituted for the superintendent's discretion that of those persons who got the messages in the chief train dispatcher's office, and that the chief train dispatcher upon this proof was the alter ego not only for the movements of trains, but for the duties laid on the superintendent. If the road established such a custom, it necessarily substituted the person who got the message in place of the superintendent himself. It could not prevent access to the superintendent by a custom of that sort and still be permitted to say that only the superintendent was the alter ego. This, however, does not in my judgment meet all the difficulties which the Circuit Court of Appeals found in the plaintiff's case as originally presented. 176 Fed. 331. It is of course, well settled that, if the master delegate to any one else his own duty of providing his men with safe tools and appliances, he cannot excuse himself for a default because it arose from the negligence of those to whom he delegated it. This is settled by so many authorities that I need not cite any. If in this case, therefore, there was a default in furnishing safe appliances, the master was liable. But I do not think there was any default in that duty. The engine, when it started, had been repaired, and so far as appears was in reasonably safe condition. It is true that on its last inspection certain defects were found; but these had been corrected in the repairshop, and there was no evidence from which the jury could find that it was not reasonably safe when it started. The master of course is not responsible from minute to minute for any defects which arise. His duty is limited, first, to furnishing suitable appliances, and, then, to making proper inspection from time to time at reasonable intervals. The duty to inspect did not arise until the locomotive was again returned to the place where it could be looked over and the break remedied, not while the locomotive was en route. The question, therefore, becomes whether the defendant was negli-

gent in the management of the engine before it got back to a round-house where it could be inspected and repaired. I must assume from the proofs that it was negligently run, for certainly that was a question for the jury; and, therefore, the question is: Who was the negligent person in permitting it to be used as it was until it got to the Port Morris yard? If there was negligence, clearly the engineer and the conductor shared in it; but they were fellow servants, and to hold the defendant some alter ego must have contributed his own negligence to the accident. As the proofs now stand, there must be some evidence of the negligence of the chief train dispatcher. Upon that I think the last paragraph of the opinion of the Circuit Court of Appeals still controls. The words I refer to are these:

"Even if the train dispatcher knew or thought the defect was one likely to make it dangerous to proceed with the engine in that condition. he had a right to suppose that the engineer had disconnected the disabled side, as the proofs show he could perfectly well have done. The purpose of the message was to get from the train dispatcher the remedy which the conductor thought applied to the situation, namely, the pusher, and this was promptly supplied."

In this trial the plaintiff thinks that he has met this difficulty by the testimony of Smith, who swore that, although the disabled side of the locomotive could have been disconnected, still there would have been a strain caused by the revolution of the rod. Smith's testimony in that respect is in substance as follows:

"If he had killed that side, it would have done no work; but the revolution of the rod would have still caused a strain on the lower guide after that, unless he was able to take down the main rod, which he could not have done."

This testimony, brought out on cross-examination, was directed to a strain on the lower guide which had not broken and which was not the cause of the accident, because it was the upper guide which had been lost. The witness' testimony was somewhat confused as to whether there was any strain upon the top guide except in backing; but of course that confusion was for the jury to resolve. However, this testimony is far from showing that the accident might still have happened if the right side had been disconnected. Laying aside the fact that he only says there would have been a strain on the lower guide, and even assuming that from it the jury might have inferred that there would also have been an upward strain, it nowhere appears that had the side been disconnected the strain was serious enough to cause a break. As the whole theory is that it was negligence for the chief train dispatcher not to insist upon the removal of the engine and for him to assume that the conductor could not have safely dealt with the situation, some such proof as this was essential to the plaintiff's case. Again, even if the engine with the tools actually at hand could not in fact have been so disconnected as to remove all danger, yet the chief train dispatcher, acting in the stead of the superintendent, still had a right to suppose, as the Circuit Court of Appeals holds in effect, that the men on the ground would neutralize that danger, or else keep the employés away from the injured side of the engine. It is not as though the chief train dispatcher had been consulted as to how the situation should be managed; nor was he to assume that the discon-

nection of the injured side was the limit of the possibilities of the men on the spot. The conductor assumed responsibility for the situation by asking for a pusher, and the chief train dispatcher could rely upon his doing what was necessary. When he said that the top guide was lost, it was to explain why he asked for the pusher, not to state the facts and ask for advice; he was then speaking, not to the superintendent at all, but to the chief train dispatcher, and asking that a piece of rolling stock be moved from one place to another. Therefore the information to the chief train dispatcher did not disclose to him a situation necessarily so dangerous that nothing short of entirely disconnecting the locomotive would have made it safe. Perhaps in that case the failure of the chief train dispatcher to intervene by affirmative action would have been a ground for negligence.

I cannot see that a substantially different case has been shown from that passed on above, and I shall therefore have to deny the motion for a new trial.